Thank you, Mayor. Please, the Court, Eric Olson, I represent Alarm Protection. I'd like to reserve five minutes for rebuttal, if possible. I'd like to focus my argument today on the motion for judgment as a matter of law that should have been granted limiting safes damages claims to those six customers where there was evidence of wrongful conduct causing them to cancel their accounts with SAFE. The jury's award should have been limited to those six, and it would have been six times SAFE's account valuation of $2,475. The trial court acknowledged in denying the JMOL motion that the jury's verdict depended on an inference that defendants' conduct involving six customers extended to the great majority of SAFE's Alaska customers with whom Alarm Protection had contact. That inference had some evidence in the record, did it not? To wit, the training which your clients' people got to apply to their task of taking clients away from the appellee. Now, there was training as to an upgrade or update technique, and there was evidence of one customer, one customer, who allegedly received that technique, Ms. Whelan. That was it. That was the up-ticketing. Now, it was called upgrade, a particular sales technique, and there was evidence of one customer. You can't take training that allegedly leads to one lost account and extend that somehow to hundreds of accounts. There's not a basis for that in the record. There is no evidence of how many customers in Alaska Alarm Protection contacted. There was no evidence providing a basis to infer contact beyond six, and thus no basis for a verdict of over $900,000 without total speculation by the jury, which should never have been allowed. The jury was properly instructed in instruction number 21 that it had to find causation on the first three claims before awarding damages, and damages on the three claims had to be calculated based on the number of accounts taken improperly. All three of those claims required evidence of causation. The State Unfair Trade Practices Act claim, which applied to six customers who were identified, required causation. The Alaska Trade Secrets Act, as to which there was no evidence of a loss resulting from an alleged misappropriation of trade secrets. And third, the Lanham Act requires causation. Now, SAFE tries to justify the jury's speculation by referring to a number of nice circuit and other cases involving relaxed standards of proving causation and damages and so-called crude methodologies of calculating damages. The problem is there is — Well, the law does allow to have — we do accept some crude measures of damages based on reasonable inferences, Skydive, Arizona. So it's, you know, that — there is some — you know, when you ask for a judgment with notwithstanding the verdict, you're basically — there's got to be no evidence including inferences as far as that goes. And the jury certainly — you could say, well, I don't think it was the strongest case, but to say there was no evidence is really a pretty difficult rock to push uphill. Well, the problem is there is a causation element and a damages calculation element. You've got to prove the fact of damages before getting to the amount of damages. And this is a plain and simple lost profits damages case under the Lanham Act. There is no relaxed standard that applies to this type of claim. They've introduced evidence that their attrition rate in Alaska was greatly different and greatly higher than it was nationwide. Why can't a jury infer that based on the training received by your client's people, the actions that were taken with respect to at least six of the customers, that those actions continued during the period involved and were responsible for the increased lack of — increased attrition? The problem, Your Honor, with this attrition theory that was presented for the first time in closing argument, it was not presented by an expert of any kind. The problem with the theory — It was presented in closing argument because there was evidence of it from which to argue in closing argument, correct? Incorrect, because here's the evidence. Here's the evidence that was provided. This is what was in the record on the attrition theory. SAFE had 819 lost customers in Alaska, each valued at $2,475. SAFE presented its customer attrition percentage, as Your Honor mentioned, in Alaska and its customer attrition percentage in the lower 48. And SAFE called Randy Perkins, fact witness, who testified that while there were service problems that were on par in both places, customer moves and competitor solicitation were substantially higher in the state of Alaska. What was missing was any fact or expert testimony tying the excessive attrition in Alaska to wrongful conduct by alarm protection, as opposed to lawful competition, lawful solicitation, the increased moves in Alaska, or any other non-actionable circumstances. Did you present any evidence on that score? We absolutely did. We called a number of witnesses, several witnesses who testified that they canceled with SAFE to go to someone else. They canceled with SAFE because they moved. They canceled for any number of reasons. We provided all the customer notes. That's why we have jury trials. They put on their evidence and ask for their inferences. You put on your evidence that eats away at that, and then they're instructed as to the burden of proof, and you both argue it, and then the jury decides what they believe. And they didn't believe. They didn't believe your side of the story. Not quite. The problem, and I understand Your Honor's point regarding jury trials, absolutely. Well, right. I mean, the jury argument here is not what we do in appellate court. The problem is that, and this was illustrated well in the Farley transportation case, a case involving a motion for new trial, where you had, it was an antitrust case that applies in those cases, at least for causation. And even with that relaxed standard, a new trial was needed because there was no segregation between the customers lost for wrongful conduct and the customers lost for lawful competition. That's the reality that we have here. You've got to have some rational nexus between wrongful conduct and some loss that you've suffered. That's causation. That's how it works. Now, the court mentioned a few moments ago, you know, how about doing some kind of comparison, back to Judge Baez's point. So given the six people that they put in, I mean, certainly, you know, I can see why the jury thought that was pretty sleazy conduct. And the inference from that is if you're doing it with six people and then there's all of this loss, if that's how they're dealing, if that's their whole approach of getting customers, that doesn't put your client in a very good light with the jury. Oh, it absolutely didn't. I mean, that could explain the jury's verdict, Your Honor, exactly. The problem is the jury couldn't get there without some evidence of how many customers alarm protection even contacted, let alone whether there was wrongful conduct in those contacts. But in order to do the comparison. Well, I guess you contacted all those people and rebutted it, right? And we did. We offered a lot of that, but there wasn't a need for us. There was not a need for us. There was, because what you put on didn't rebut what they presented to the jury. As in Farley Transportation, it's the plaintiff's job to put on evidence showing a causal link between wrongful conduct and an actual loss. And they failed to put on that evidence, establishing that causal link beyond six customers. We're talking about the JMOL, which is different than whether you should have won or lost the trial. So they put on evidence that in Alaska, if I recall, is 21 percent attrition. Nationwide, it's about 11 to 13 percent attrition. They put on evidence of wrongful conduct. What's wrong with the district court's conclusion that it was a permissible inference, even though it's not perfect? Well, there are a few reasons. One, you've got a series of cases that say when a relaxed standard applies. And this is not one of those cases. This is not a case involving comparative advertising where you've got some kind of presumption, a widely disseminated statement leading to some kind of burden shifting, conduct by the defendants making it impossible for the plaintiffs to just run a standard damages calculation. And it's not an antitrust case that would involve some kind of yardstick methodology where you're doing that kind of comparison. But even if it were, the comparison that they were trying to run doesn't work. In all the cases that have been cited using this yardstick type of method where you're using a proxy to try to create your damages calculation, in all of those cases it has to be a proper comparison. You have to have some clean sample, such as several years of sales without some kind of wrongful conduct, and then you have to have a sample that includes evidence of actual wrongful conduct. But it has to be an actual apples-to-apples comparison. Here it was apples-to-oranges because, as their own witness acknowledged when he went through his attrition comparison, it was different in the lower 48 from Alaska because you had increased solicitation, not necessarily by alarm protection, there was no evidence of that, and increased moving that led to cancellations in Alaska. So you didn't have a true apples-to-apples comparison that would have allowed for the yardstick method. The yardstick method has never been used in a lost profits damages case that's been cited here in this case. So there wasn't a basis for making reasonable inferences that alarm protection talked to any number of customers beyond the six, let alone making improper statements to them. We're down to about a little over three minutes. Do you want to reserve? Yes, Your Honor. I'll go ahead and reserve the remainder of my time. Thank you. Good morning. I'm Robert Salander, and I represent Security Alarm Finance. Would you pick up on your learned friend's last argument that the comparison was not valid, that the sales statistics in the lower 48 responded to increased cancellations and more moving, rather the other way around, that Alaska had increased cancellations and more moving than the 48 states below. Can you respond to that? Yes, I'd love to respond to that. That was an argument that they made to the jury and to Judge Gleeson several times. And so the evidence on that that existed was, well, not much. They did not show that and did not prove that Alaska had any higher moving or any higher market conditions. They would talk about the geography of Alaska and ask the jury to infer that it was difficult to get to some portions of Alaska. There were some indications of that, but there was no kind of evidence that more people move out of Alaska than move out of other states or that there's any kind of these changes. What the evidence on this was, was that really from SAFE and the statistical inferences and comparisons that you can draw, there were a couple. So first of all, SAFE, who's been in business for many years, had this historical attrition rate of, depending on which witness it was, was 11 to 12 or 9 to 13 percent, but a fairly low attrition rate and a fairly consistent attrition rate, and the testimony from the CEO of why it was so critical that SAFE stay on top of that attrition rate and that it be accurate for its business model and its other business relationships. So that was a baseline nationwide. We had a second baseline, which was from the Pinnacle Acquisition. And the Pinnacle Acquisition was not just in Alaska. It was all over the country and, in some cases, I think Canada and Puerto Rico. And that attrition rate mirrored SAFE's historical attrition rate in the approximately 12 percent rate. We have the testimony of the chief operating officer who explained what the reasons are for normal attrition, which include all of these things that APT wanted to argue. So customer cancellations, move-outs, whatever reason, dissatisfaction, a whole bunch of things. We also had, then, testimony from SAFE about the efforts it goes to to try to retain customers and to solve issues with non-working equipment or customer dissatisfaction, all the things that go into having maintained a fairly constant attrition rate over the years. Then we look at Alaska. So you could compare Alaska to SAFE generally, or you could compare Alaska to Pinnacle outside of Alaska. And the reason those comparisons were important is because one of APT's arguments was that the Pinnacle customers were an inferior type of customer, that Pinnacle had inferior equipment, or just issues with Pinnacle that would make the Pinnacle customers more likely to quit. Question. Did you introduce evidence of Pinnacle's experience in Alaska? We did not. We did not have that available. So that was not evidence that we could get. What we did, though, is introduce evidence that when SAFE purchased the Pinnacle accounts, it did not purchase all Pinnacle accounts, but there was a fairly detailed due diligence process that went through to qualify accounts, and that accounts had to be of a certain quality with working equipment with no outstanding service issues. And so SAFE went through a pre-purchase due diligence process to make sure that what it was purchasing was quality accounts and accounts that were of the same nature as fits into its portfolio. So you didn't have any evidence of what was the attrition rate in Alaska by any other company before you bought? Correct. We did not. We did have evidence, though, that two things, that during the same times or peak periods that SAFE was losing its customers, because they didn't all quit like in a steady pace across the year, there would be high periods of cancellation. Those corresponded to when APT was most active and had the highest number of salespeople active in Alaska. So there was that correlation. And then we also had evidence to show APT's increasing customer base in Alaska at the same time that we were decreasing, which could create the inference, or a jury could believe from that, that there was no difference between the Alaska market and any other market. And I guess the final point on that is that we have eight Alaskans that APT is trying to convince, hey, your state is different and is a bad market. And I guess they get to decide whether they believe that or not. Well, you've talked about, you know, okay, Intel says we've allowed damages to be shown by inferences, similar to the extrapolation theory that you used here. But that said, the defendant was free to rebut that in proffered evidence. But here the defendants offered cancellation letters, but they were excluded. So why wasn't that error, especially in light of the court allowing your extrapolation theory? The reason it was an error is... What's good for the goose is, you know, you open the door. When the barn door flies open, then you zoom in for cross-examination or put evidence to rebut that. And it seems that they did get to put some evidence in, but they didn't get to put exactly what they wanted to. They actually did get to put in what they wanted to, but not in the form they wanted to do it. And so let me address the question this way. The exclusion of the cancellation letters, I'm going to jump to the end of that argument, and then I'll come back. It was not prejudicial to them because they were able to get in SAFE's customer notes. Customer notes were notes that a SAFE customer service representative would type into the computer when they would contact. A customer would cancel, they'd get a cancellation letter, they'd be contacted by customer service. Customer service, that call would be put in these computerized customer notes. Those were produced in the case and they were offered in evidence by APT. So they had the ability to get in the evidence of other reasons. Well, the court does have inherent authority to decide what, you know, I mean, whether something's cumulative or the form of things. But what was wrong with these cancellation letters? Yes, and that's the beginning part since prejudice is the end of the analysis. The beginning of the analysis were they had a hearsay problem, and it was a double hearsay problem because we had evidence and there had been a lot of discovery work and motions with regard to who actually wrote the cancellation letters. And we had admissions from two of APT's salespeople that they wrote them. And so these other cancellation letters, we did not have any evidence of who actually wrote those cancellation letters. So some cancellation letters we knew they wrote. These other cancellation letters we had asked for discovery from APT, tell us did your salespeople write any of these. They objected to that on the grounds that it was overburdensome for them to provide that information and that the letters were not relevant anyway. And so on those bases, Judge Gleeson did not allow us the discovery to be able to go in and identify whether there was objective indications of trustworthiness of these cancellation letters. So on that basis, she excluded them, and I believe properly so. If we had not had all of the litigation and the discovery motions and the effort that had resulted in our finding that APT was actually out writing those letters, Judge Gleeson may have come to a different decision. But because of all of that work and the indication that these might not be trustworthy, I think they were properly excluded. One additional reason was they weren't necessarily a contemporaneous statement of the person's state of mind. As Judge Gleeson found, if they were written by the customers, they were written with the intention of escaping obligations under a contract, which she then cited as a reason that they may not come within a state of mind exception. So they just were not trustworthy, and the fact that there was other evidence from which they could argue the same thing and did argue the same thing made the exclusion of those cancellation letters not only proper but not prejudicial. You would agree that the damage calculation was entirely inferential? I want to say yes, but I don't totally agree with the word entirely inferential. I think that what we had was we had certain facts and we had, well, at least the six customers. It wasn't inferential. And there were actually 18 people that came in and testified either live or by phone call or by videotape. But, yes, when we get to the number, the total number of lost, I agree with Your Honor that that was inferential, and appropriately so because how could we get it any other way? Well, you didn't put on an expert witness who said, here are the damages. I've looked at the statistics and, in my opinion, the damages were, X amount of damages were caused by the actions of the company. So it's a little bit different from the case where you're arguing inferential damages, but it's based on expert testimony. As I read it, it's just you put out some numbers showing a difference in attrition rate. You put out some evidence of wrongful conduct and then ask the jury to draw the line of correlation, right? That's exactly what we did. In that context, no expert is required. It doesn't require any specific knowledge, skill, training, or experience. It's not a scientific calculation. It's not a social science experiment to determine that these kinds of calculations can be made. It's completely within the kin of the jury to be able to make a mathematical calculation like that and doesn't require an expert. All it does is require a factual determination that an expert really isn't there to testify to anyway. The causal effect is shown by the differences, and given the amount of evidence that went into explaining how safe controls for attrition rate and the kinds of activities that APT was engaging in as an overall scheme, I think the law recognizes that when you have an overall scheme like APT engaged in here, that does make it difficult to identify individualized damages or damages with great precision, that the losing defendant can't be heard to complain that damages weren't calculated with more precision. In fact, we all know that damages don't need to be calculated with precision, and we've looked for a lot of cases on this customer-by-customer proof issue. It comes up and is generally rejected. The only time it has not been rejected has been outside the context of the issue of damages and causation. It's come up and been identified, for example, where the plaintiff was not able to show a sufficient broadcasting or substantial communication with numbers of people to create a false advertising sort of scenario, so they weren't able to prove an initial element of their cause of action. But in terms of damages, I'm out of time. Can I just finish this answer? Sure. In terms of damages, you would have to ask yourself, what would a trial look like if it had to be tried the way APT is saying here? And so if we use 400 customers as the number, are we really going to require 400 people to come in? That's, you know, even at 15 minutes a witness, which is pretty tough to get a witness on and off. That's 100 hours of trial just hearing these people say the same thing. So with that, I would submit the case and request that you affirm the judgment. Thank you, Counsel. Rebuttal? Thank you, Your Honor. Two points. First, it was SAFE's testimony that there were more moves and more competitor solicitations in the State of Alaska. That's Randy Perkins on SCR 653. SAFE had no history in Alaska, and there was no evidence of Pinnacle's history in Alaska. Thus, there was no control group. There was not a proper proxy and not a proper comparison. SAFE's attrition theory put the jury in no better position than in the Farley case. There, the plaintiff presented some evidence of how its competitor's business was infected by an illegal scheme and some evidence of the total business that was attracted to the competitor, but no evidence on the portion of diverted business attributable, quote, solely to the illegal scheme, close quote. There was no way in that case for the jury to parse out wrongful conduct from other causes, such as lawful competition. And the same was true here, where the jury was left to speculate beyond the six. It was entirely inferential beyond the six customers. Was there any indication that Pinnacle's experience in Alaska before they were bought was not available to SAFE? There's no evidence that that evidence was unavailable. I don't know that that argument was ever presented below. Second point I'll make quickly as to cancellation letters. That would give us further evidence of why customers left. Yes, we had the customer notes, but the customer notes didn't completely overlap with the customer cancellation letters that were before the court. By the way, the record has been supplemented as to all of those cancellation letters. Judge Gleeson did enter that ruling recently. Discovery that counsel referred to was on a series of form cancellation letters that looked exactly the same that would have been written up, allegedly by alarm protection representatives. What we're talking about here is a, and the court can read them, they're in the record, I think there were over 150 customer cancellation letters. Some of these are on customer letterhead, all laying out the reasons customers canceled. It's entirely admissible under the state of mind exception in Rule 803.3. It was error for the court to exclude these cancellation letters. Even if, even if, somehow this entirely inferential damages theory could have been permissible, it could have been presented to the jury. Do you agree with your learned friend that you objected in Discovery to a production of those letters as being irrelevant? No, this is to those form letters that I mentioned. That's what the Discovery centered on. And what we're talking about here is the ones that actually came from customers. There were a whole bunch of them. It was all presented to the court, and the court's ruling. Which ones did you object to as being irrelevant? Those form letters that were all written up by, allegedly by sales representatives. They look exactly the same. They're this big. They take up less than half of a page, and they say almost exactly the same thing. What about the indication the judge seemed to think that these cancellation letters were written by your client? That's not what the court ruled as to the 150 cancellation letters at issue in the motion in limine. That's a different issue. What the court ruled on in the motion in limine was the 150 plus cancellation letters that laid out reasons for cancellation. And as to those letters, the court simply ruled under Rule 403, sua sponte, that they were prejudicial and they shouldn't be admitted. There was a risk of unfair prejudice. But when you look at the substantial prejudice that ended up running to alarm protection from the exclusion of those letters, not being able to show that customers left for any number of reasons, that was absolutely substantially prejudicial to us. I have a forecasting on that the court said that you had written some of the letters. Where's that in the ‑‑ I'm not pulling that out of nowhere. Yes, the issue ‑‑ that's an issue that came up in discovery, as counsel mentioned. That did not come up in the motion in limine, which centered on the 150 cancellation letters that we were trying to get into evidence. The court excluded those 150 under Rule 403, sua sponte. That was not based on a discovery ruling previously. So, anyway, I'm out of time. We appreciate the court's attention today. Thank you. Thank you, counsel. The case just argued will be submitted for decision. Thank you both for your arguments this morning, and we'll be in recess for the morning. Thank you.
judges: Thomas, Callahan, Bea